# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL C.,[1]

Plaintiff,

v.

KILOLO KIJAKAZI,[2]
Acting Commissioner of Social Security,

Defendant.

Case No.: 1:18-cv-1935-JDB-RMM

## REPORT AND RECOMMENDATION

Plaintiff Michael C. brings this action under the Social Security Act, 42 U.S.C. § 405(g),

seeking review of a decision of the Commissioner of Social Security to deny his claim for

disability insurance and supplemental security income benefits.  District Judge John D. Bates

referred the case to the undersigned for full case management.  *See* Order, ECF No. 7.  Pending

are Mr. C.'s Motion for Judgment of Remand, ECF No. 13, and the Commissioner's Motion for

Judgment of Affirmance, ECF No. 15.  Having reviewed the Administrative Record,[3] the parties'

briefs,[4] and the relevant law, the undersigned recommends that this Court grant-in-part and deny-

in-part both parties' motions and remand this case to the Agency, for the reasons that follow.

---

[1] Plaintiff's name has been partially redacted in keeping with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Mem. from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt., to Chief Judges of the U.S. Cts. of Appeals, Chief Judges of the U.S. Dist. Cts., Clerks of the U.S. Cts. of Appeals, and Clerks of the U.S. Dist. Cts. (May 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf.

[2] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d) and the last sentence of 42 U.S.C. § 405(g), Ms. Kijakazi is substituted for Nancy A. Berryhill as the Defendant in this case.

[3] Page citations to the Administrative Record, ECF No. 10 ("AR"), refer to the running pagination at the lower right margin.

[4] The relevant briefs are Mr. C.'s Mot. for J. of Remand, ECF No. 13 ("Pl. Mem."); Def.'s Mem. Supp. Mot. for J. of Affirmance & Opp'n to Pl.'s Mot. for J. of Remand, ECF No.

# BACKGROUND

Mr. C. filed applications for disability insurance and supplemental social security income benefits in March 2017, alleging disability beginning July 1, 2015 (his "onset date").  AR 269–80.  At the time of his application, Mr. C. was forty years old and living on the streets of Washington, D.C.  *See* AR 269, 455, 605–06.  He is a high school graduate and veteran who has previously worked as a customer service representative, chef, construction project manager, warehouse worker, and security guard.  *See* AR 54–57, 390, 465, 796.  He has been diagnosed with several mental health illnesses, including posttraumatic stress disorder (PTSD), attention deficit hyperactivity disorder (ADHD), bipolar disorder, personality disorder, and oppositional defiant disorder.  *See* AR 395, 706, 709.  Many of these illnesses stem from a traumatic childhood.  *See* Pl. Mem. at 2.  Mr. C. survived family violence and sexual abuse, was placed in a residential treatment program, and eventually transitioned through more than a dozen foster homes.  *See id.* (collecting record citations).

Mr. C.'s disability benefits claim was denied at both the initial and reconsideration levels of review.  AR 172, 187.  At Mr. C.'s request, an Administrative Law Judge (ALJ) conducted a hearing and concluded that Mr. C. was not disabled for purposes of the Social Security Act.  AR 29.  The Appeals Counsel denied Mr. C.'s request for review.  AR 1.  Mr. C. now asks this Court to vacate the ALJ's opinion, which constitutes the Commissioner's final decision, and remand his application for disability benefits to the Social Security Agency (SSA) pursuant to 42 U.S.C. § 405(g).

---

16 ("Comm'r Mem."); and Mr. C.'s Reply Supp. Mot. for J. of Remand & Opp'n to Comm'r Mot. for J. of Affirmance, ECF No. 17 ("Pl. Reply").  The Comm'r Mem. was also filed at ECF No. 15, and Pl. Reply was also filed at ECF No. 18.  Throughout this Report and Recommendation, page citations to documents in the record other than the AR, *see supra* note 3, refer to the document's original pagination, unless the page is designated with an asterisk (e.g., *1), in which case the reference is to the pagination assigned by PACER/ECF.

### I.    Legal Framework

To qualify for benefits under the Social Security Act, a claimant must demonstrate a disability that renders him unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of [at least] 12 months."  42 U.S.C. §§ 423(a), 423(d)(1)(A), 1382(a)(1), 1382c(a)(3)(A).  An applicant must support his claim with "[o]bjective medical evidence."  *Id.* § 423(d)(5)(A).

The Commissioner uses a five-step process to determine whether a claimant is disabled under the Act.  20 C.F.R. §§ 404.1520, 416.920; *see also Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004) (describing each step).  At step one, the claimant must show he is not engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step two, the claimant must show he has a "severe medically determinable physical or mental impairment" or combination of impairments.  *Id.*  At step three, the Commissioner must determine whether the claimant's impairment or impairments meet or equal an impairment in the Commissioner's Listings maintained at 20 C.F.R. pt. 404, subpt. P, app. 1.  If the claimant's impairment is listed, or if his impairments together "equal" an impairment in the Listings, the Commissioner will conclude that the individual is disabled and end her inquiry.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4); *see also Petty v. Colvin*, 204 F. Supp. 3d 196, 200 (D.D.C. 2016).

A claimant is not necessarily precluded from receiving benefits under the Social Security Act if his impairments do not meet or equal any entry in the Listings.  The Commissioner must next assess the claimant's residual functional capacity, or "RFC."  20 C.F.R. § 404.1520(a)(4), (e); *id.* § 416.920(a)(4), (e).  Residual functional capacity measures what an individual "can do in a work setting" despite the person's physical and mental limitations.  *Id.* § 404.1545(a)(1).  The RFC is then used to determine, at step four, whether the claimant's impairments prevent him

from performing "past relevant work," *id.* §§ 404.1520(a)(4), 416.920(a)(4), and at step five, whether the claimant can perform other work that exists in the national economy consistent with the claimant's RFC, age, education, and work experience.  *Id.*; *see also Butler*, 353 F.3d 997.  If an individual's claim fails at either of these steps, the Commissioner will conclude that the individual is not disabled and deny the claimant's benefits request.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

## II.    Record Evidence

Mr. C.'s medical records demonstrate that he has struggled with mental illnesses for his entire life.  He was first diagnosed with ADHD between the ages of four and five.  AR 689–90, 694.  By thirteen, he had also been diagnosed with oppositional defiance disorder.  AR 693.  According to Mr. C.'s reports to clinicians, he was also diagnosed with a personality disorder in 2010 while serving in the United States Army, leading to his honorable discharge.  AR 390, 465.

More recently, in December 2014, Mr. C. was diagnosed by nurse practitioner Rebecca Lopez and Dr. Andrea Pellegrini at Gulf Coast Psychological Services in Houston, Texas, with bipolar disorder, PTSD, ADHD, a mathematics learning disorder, and a history of sexual abuse and neglect as a child.  AR 388–95.  Nurse Lopez and Dr. Pellegrini also documented "evidence of distractibility," a "hard time focusing and paying attention," difficulty "following through on tasks," a tendency to be easily frustrated, distrust of others, mood swings, and irritability.  AR 388–90.  In October 2015, approximately four months after his alleged disability onset date, Mr. C. was again diagnosed with bipolar disorder, PTSD, and ADHD by providers at the Harris Center for Mental Health in Texas.  AR 400.  Following Mr. C.'s relocation to Washington, D.C., Dr. Sana Kamal at the D.C. Department of Behavioral Health reconfirmed in February 2017 the diagnoses of bipolar disorder and PTSD, noting that Mr. C. had a "shortened" attention

span, "racing thoughts," and reported becoming "distracted easily while reading books and watching movies." AR 464–65, 467.

Despite this long history of mental illness, Mr. C.'s medical records evidence only sporadic mental health treatment.  In 2014, after Nurse Lopez and Dr. Pellegrini concluded that Mr. C. would likely "greatly benefit from medication maintenance" and should be referred to a psychiatrist for possible "medication intervention," Mr. C.'s medical records lapse for nearly ten months, until October 2015.  *See* AR 395, 400.  Records from the Harris Center begin at that time, indicating that Mr. C. sought treatment and was prescribed medications including Trileptal, Strattera, and Celexa.  AR 404, 407.  Harris Center records show Mr. C. had begun "seeing progress with the medications" in November 2015, AR 420, and was "stable on medications" in February 2016.  AR 432.  Yet by May 2016 the Harris Center auto-discharged Mr. C. because he could not be located.  AR 402.  His medical records pick up again in July 2016, when Unity Healthcare in Washington, D.C., referred Mr. C. to the DC Department of Behavioral Health for a mental health assessment.  AR 455.  The assessment occurred several months later, in February 2017, when Dr. Kamal affirmed Mr. C.'s longstanding mental health diagnoses.  AR 464, 467.  At that time, Mr. C. communicated that he did not wish to see a therapist and reported that he had been "completely off medications for [the] last 2 years"—a timeline contradicted by the Harris Center records, but consistent with Mr. C.'s documented history of repeatedly beginning and then discontinuing, without physician oversight, his medication regimens.  *Compare, e.g.*, AR 465–66 *with* AR 432.

Mr. C.'s medical records also show sporadic therapeutic treatment for his illnesses.  He attended individual therapy sessions with Doctors Marcus Patterson and Keisha L. Mack in March 2017, where he appeared "engaged" and "ready to participate."  AR 480.  It seems that

Mr. C. attended the sessions with Drs. Patterson and Mack in hopes of obtaining permission to enroll in a CDL training course; his stated goal was to eventually gain employment as a commercial truck driver.  *Id.*  The doctors concluded that Mr. C. was psychologically equipped to participate in the training and work as a commercial driver, and that Mr. C. had "appropriate coping strategies to access during times of frustration and has expressed his desire to continue therapy as appropriate."  AR 480–81.  Mr. C. sought additional psychiatric services from a charitable provider in April 2017, *see* AR 536, and attended additional therapy sessions in May and October 2017.  AR 585, 719.  But his treatment records remain inconsistent at best: At the May 2017 session, for example, Nurse Lateshia Jackson noted that Mr. C. presented "for medication appointment alone" but "declined medication management at this time."  AR 585.  In October 2017 he met with Dr. Angiolina Melchliorre, who diagnosed Mr. C. with a mood disorder and prescribed Depakote, a mood stabilizer.  AR 720.

### III.   Testimony at the Administrative Hearing

The administrative hearing for Mr. C.'s disability claim was held in December 2017, two months after the appointment with Dr. Melchliorre.  AR 34.  Mr. C.'s testimony both confuses the medical record and helps contextualize it:  At the hearing, Mr. C. testified that he had received "no medication, no therapy" from D.C.-area providers.  AR 41; *see also* AR 59–60.  He also said that he had taken medication only in 2011, AR 42, and that he felt medication was not "the answer" to managing his mental illnesses.  AR 61.  He described medication as making him feel "like a zombie" and "comatose," such that his speech was slowed and he was "caught drooling several times in public."  AR 73.  It does not appear from the hearing testimony that Mr. C. was then taking the Depakote prescribed by Dr. Melchliorre.  *See generally* AR 41, 59–61.

Mr. C. also contextualized his sporadic treatment history as being a side-effect of his homelessness and lack of resources.  He expressed frustration with relying on a charitable

organization for mental health treatment, resulting in frequent turnover of psychiatrists and long delays between his appointments.  AR 59, 63, 74–75.

The ALJ also received testimony from Mr. C. regarding his subjective experience of symptoms related to his mental illnesses.  Mr. C. described his thoughts as racing "like a Twitter feed" and "the Matrix," with "all the code . . . going 15,000 hours."  AR 71.  He also discussed his irritability and difficulty working with others, including through an anecdote about a workplace altercation that caused him to lose a job as an offshore chef.  AR 55–57.

Also testifying at the hearing was Ms. Juanita Williams, an outreach benefits specialist with Pathways to Housing D.C., the charitable organization that assisted Mr. C. with applying for social security benefits.  AR 50.  Ms. Williams testified that she saw Mr. C. "pretty regularly" while he was homeless, but that she had seen him less frequently since he obtained housing.  AR 51; *see also* AR 66.  She provided examples of Mr. C.'s difficulty concentrating, stating that it took Mr. C. two hours to answer a question that would ordinarily take most people between ten and thirty minutes.  AR 66–67, 68.  She also testified to Mr. C.'s irritability and difficulty interacting with others, particularly men, such as when Mr. C. got into an altercation with a security guard at a Veterans Affairs office over an ID check.  AR 67–68.

The ALJ also received testimony from a vocational expert, Dr. James Ryan.  To assist the ALJ in determining whether Mr. C. could perform work that exists in the national economy, the ALJ asked Dr. Ryan what type of work would be available to a person of Mr. C.'s age and educational attainment level, with full physical exertional capacity, who was limited to carrying out simple tasks in two-hour increments with fifteen-minute breaks in between; occasional interaction with coworkers and supervisors; no direct interaction with the general public; and with the ability to adapt to simple changes in a routine work setting.  AR 86.  Dr. Ryan testified

that such an individual could work as a packer or packing worker, machine tender, or janitor. AR 89.  The ALJ then modified her hypothetical to add that the same individual "would be off task" twenty percent of the time.  *Id.*  Dr. Ryan testified that no jobs would be available to that individual.  *Id.*  In response to a question from Mr. C.'s attorney, Dr. Ryan also testified that no jobs would be available to a person who was not able to react appropriately to social norms frequently based on receiving feedback from a supervisor.  AR 96–97.

## IV.   The Commissioner's Decision

The ALJ issued her decision on January 31, 2018, finding that Mr. C. was not disabled and accordingly not entitled to disability insurance or supplemental security income benefits under the Social Security Act.  AR 29.  The ALJ determined that Mr. C. met the insured requirements of the Act; that he had not engaged in substantial gainful activity since his onset date; and that Mr. C. had "severe impairments" of personality disorder, bipolar disorder, ADHD, PTSD, a learning disorder in mathematics, and "marijuana abuse."  AR 17.  She nevertheless found that he was not disabled because Mr. C.'s impairments did not meet or equal the severity of any of the impairments in the Commissioner's Listings, AR 18, and because significant jobs existed in the national economy at Mr. C.'s residual functional capacity to permit him to successfully adjust to available work.  AR 28.  The Appeals Counsel denied Mr. C.'s request for review.  AR 1.  Mr. C. has now asked that this Court review the ALJ's opinion pursuant to 42 U.S.C. § 405(g).

## LEGAL STANDARD

The Court will uphold the Commissioner's decision to deny an individual disability benefits if the decision "is based on substantial evidence in the record and correctly applies the relevant legal standards."  *Butler*, 353 F.3d at 999.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971) (internal quotation and citation omitted); *see also Butler*, 353 F.3d at 999 (substantial evidence is "more than a scintilla, but . . . less than a preponderance"). The Court must "carefully scrutinize" the administrative record for substantial evidence, but may not reweigh the evidence considered, *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 32 (D.D.C. 2014) (quotation omitted), as the Court's review is "highly deferential to the agency fact-finder." *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).  The Commissioner's decision must nevertheless show that she "analyzed all evidence" and "sufficiently explained the weight" given to "obviously probative exhibits, including evidence that was rejected."  *Warfield v. Colvin*, 134 F. Supp. 3d 11, 14 (D.D.C. 2015) (internal citation and quotation omitted).

## DISCUSSION

This case requires an examination of the Commissioner's conclusions at steps three through five of her five-step disability determination:  First, that the severity of Mr. C.'s impairments did not meet or medically equal any impairment in the Commissioner's Listings, *see* AR 18 (step three conclusion); Second, that Mr. C. had residual functional capacity to perform work at all exertional levels but with certain non-exertional limits, *see* AR 20 (RFC determination leading into steps four and five); and Third, that sufficient jobs consistent with Mr. C.'s residual functional capacity exist in the national economy, such that Mr. C. is capable of adjusting to available work.  *See* AR 28 (step five conclusion).[5]

---

[5] The Commissioner also suggests this Court should affirm her decision because Mr. C. worked after his alleged onset date, which she says demonstrates that his impairments did not preclude him from working.  *See* Comm'r Mem. at 5, 12.  This fact does not appear in the ALJ's analysis.  The argument thus appears to be a post hoc rationalization for denying Mr. C. benefits, and should be set aside.  *See Williams v. Colvin*, 134 F. Supp. 3d 358, 364 (D.D.C. 2015).

I.    **Substantial Evidence Supports the Commissioner's Conclusion that Mr. C. Does Not Have an Impairment or Combination of Impairments That Meet or Equal the Severity of an Impairment in the Listings**

Mr. C.'s first challenge is to the Commissioner's step three determination that Mr. C.'s impairments did not meet or medically equal an impairment in the Commissioner's Listings maintained at 20 C.F.R. part 404, subpart P, appendix I.  At this step, the Commissioner was required to consider the "medical severity" of Mr. C.'s mental health impairments.  20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii).  If the "combined effect" of his impairments met or medically equaled an entry in the Listings, the Commissioner was required to find Mr. C. disabled.  *Id.* §§ 404.1523(c); 404.1520(a), (d); 416.920(a), (d).  Impairments "meet" a listing if they satisfy "all of the criteria of that listing."  *Id.* § 404.1525(c)(3).  Impairments are "medically equal" to a listing if they are "at least equal in severity and duration to the criteria of any listed impairment."  *Id.* §§ 404.1525(c)(5), 404.1526.

The ALJ here determined that Mr. C.'s impairments, "considered singly and in combination," did not meet or equal listings 12.04 (depressive, bipolar, and related disorders), 12.08 (personality and impulse-control disorders), 12.11 (neurodevelopmental disorders), "or any other listing section."  AR 18; *see also* 20 C.F.R. pt. 404, subpt. P, app. 1.  Mr. C. faults the Commissioner for not explicitly considering whether his impairments, and particularly his symptoms of PTSD, met or functionally equaled listing 12.15 for trauma- and stressor-related disorders.  *See* Pl. Mem. at 11, 13–15; *see also* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.15.  He compares the alleged error to the one in *Warfield v. Colvin*, 134 F. Supp. 3d 11 (D.D.C. 2015), in which this Court remanded a case to the Agency after an ALJ failed to assess whether the claimant's impairments matched a particular listing that seemed a likely match.  *See* Pl. Mem. at 14 (making comparison); *Warfield*, 134 F. Supp. 3d at 19 (discussing the error).

The ALJ's failure to explicitly consider listing 12.15 here is certainly curious, as the ALJ determined in step two that Mr. C.'s PTSD was a severe impairment. *See* AR 17. PTSD is usually evaluated under listing 12.15, which encompasses disorders "characterized by experiencing or witnessing a traumatic or stressful event . . . and the psychological aftermath of clinically significantly effects on functioning." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.15(a)–(b). An individual will match the 12.15 listing if:

> (A) The individual provides medical documentation of all the following (the "Paragraph A criteria"):
> (1) exposure to actual or threatened death, serious injury, or violence;
> (2) subsequent involuntary re-experiencing of the traumatic event (e.g., intrusive memories, dreams, or flashbacks);
> (3) avoidance of external reminders of the event;
> (4) disturbance in mood and behavior; and
> (5) increases in arousal and reactivity (e.g., exaggerated startle response or sleep disturbance);
>
> AND EITHER
>
> (B) The mental disorder results in extreme limitation of one or marked limitation of two of the following areas of mental functioning (the "Paragraph B criteria"):
> (1) understand, remember, or apply information;
> (2) interact with others;
> (3) concentrate, persist, or maintain pace; and
> (4) adapt or manage oneself;
>
> OR
>
> (C) The mental disorder is "serious and persistent," as demonstrated by medical documentation that the disorder has existed for at least two years, and there is evidence of both of the following (the "Paragraph C criteria"):
> (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder; and
> (2) marginal adjustment, that is, that the individual has minimal capacity to adapt to changes in the environment or to demands that are not already part of the individual's daily life.

*See* 20 C.F.R. pt. 404, subpt. P, app. 1; *id.* § 12.00(A)(2); *see also* Richard C. Ruskell, *Soc. Sec. Disab. Claims Handbook* § 2:42 n.1 (updated May 2021).

But substantial evidence supports the ALJ's determination here that Mr. C.'s mental health impairments did not meet or medically equal listing 12.15. This case is not like *Warfield*, both because the ALJ here discussed the opinion of two psychological consultants who opined that Mr. C.'s impairments did not meet or equal listing 12.15, *see* AR 26–27, and because the ALJ did not "wholly" fail to explain her reasoning at this stage of her inquiry, *Warfield*, 134 F. Supp. 3d at 19, as explained below.

A.      *The 12.15 Paragraph A Criteria*

The ALJ did not engage in Paragraph A analysis for any of Mr. C.'s mental health impairments, including PTSD. *See* AR 18–19. The oversight is harmless, however, because Mr. C. was required to demonstrate that his impairments met or medically equaled the criteria in Paragraph A *and* the criteria in either Paragraph B or C. *See* 20 C.F.R. pt. 404, subpt. P, app. 1; *id.* § 12.00(A)(2). The ALJ devoted considerably more attention to the Paragraph B and C criteria for listing 12.15. *See* AR 19–25. An error that is not prejudicial to a claimant is not a proper ground for reversal. *See Saunders v. Kijakazi*, 6 F.4th 1, 4 (D.C. Cir. 2021) ("[E]ven if we perceive error, we will affirm the Commissioner's decision unless the error is prejudicial.").

B.      *The 12.15 Paragraph B Criteria*

In marked contrast to her Paragraph A analysis, the ALJ's Paragraph B conclusions are detailed and supported by substantial record evidence. After considering Mr. C.'s work history, current self-management activities and hobbies, and reported symptoms of forgetfulness and ability to process information, the ALJ concluded that Mr. C. had a "mild" limitation on understanding, remembering, and applying information. *See* AR 19. She concluded that Mr. C. suffered from a "moderate" impairment interacting with others, based on Mr. C.'s past jobs in customer service and his participation in a recent poetry competition, on the one hand, and his "problems getting along with family," past altercations with employers, difficulty trusting

people, anxiousness when situations "do not go his way," and reported "inability to work with men," on the other.  *Id*.  She concluded that Mr. C. had a "moderate" limitation on concentrating, persisting, or maintaining pace, based on his hobbies and self-reported symptoms.  *Id*.  Based on similar evidence, as well as reported responsibilities in past jobs, the ALJ also concluded that Mr. C. had a "moderate" limitation on adapting and managing himself.  *See id*.  The ALJ relied heavily on Mr. C.'s Work History Report (Exhibit 3E, AR 313–20) and Function Report (Exhibit 4E, AR 321–28) in reaching these conclusions.  *See* AR 18–19.  She also relied on two State agency psychological consultants, Dr. Richard Milan and Dr. Nancy Heiser, who opined at the initial and reconsideration levels of review that Mr. C. had only mild and moderate Paragraph B impairments.  *See* AR 26–27 (discussing Dr. Milan and Dr. Heiser's conclusions regarding Mr. C.'s "capacity to interact with others and concentrate, persist, and maintain pace" and adapt and manage himself).  This analysis is sufficient to demonstrate that substantial evidence supports the ALJ's assessment of whether Mr. C.'s impairments met or equaled the Paragraph B criteria of listing 12.15.

### C.     *The 12.15 Paragraph C Criteria*

The ALJ also provided sufficient explanation for her Paragraph C conclusions.  The section of the ALJ's decision devoted to step three is admittedly sparse on this point, as it summarily states only that "the evidence" failed to establish "the presence of the 'paragraph c' criteria" and did not support a finding "that [Mr. C.'s] severe impediments result in only marginal adjustment despite ongoing treatment."  AR 19.  Ordinarily, a "singular statement by the ALJ" that she considered a claimant's impairments and determined they did not meet or equal a listing—including individual criteria for a listing—"is not sufficient."  *Warfield*, 134 F. Supp. 3d at 18.

The Court may nevertheless infer a proper basis for upholding the ALJ's step three determination based on the ALJ's findings at other steps. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). Elsewhere in her decision the ALJ discussed several physicians' recommendations that Mr. C. be prescribed medication. *See* AR 22 (crediting opinion of Dr. Pellegrini that Mr. C. would "greatly benefit from medication maintenance"); AR 23 (describing medical records from Dr. Kamal prescribing medication for a "mood disorder"). She also discussed record evidence that Mr. C.'s symptoms "improve[d] with medication management and therapy, when he remains compliant with . . . prescribed treatment," and that Mr. C. had seen "progress with his medications" in the past. AR 22 (crediting records from the Harris Center). The ALJ ultimately concluded that the evidence in the record showed that Mr. C. "does not consistently seek treatment [or] follow the treatment regimen" he is prescribed, and "when he remains compliant, albeit briefly, he experiences an improvement in symptoms." AR 24–25. These observations on Mr. C.'s sporadic treatment history and medical records indicating that he would respond positively to consistent treatment speak directly to the Paragraph C criteria of whether Mr. C. receives "ongoing" treatment for his mental illnesses but demonstrates only "marginal adjustment," such that his impairments meet or equal an impairment in the Listings. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. It therefore appears to the undersigned that the ALJ's conclusion as to Paragraph C—and therefore as to Mr. C.'s failure to demonstrate that his impairments met or equaled any of the Commissioner's Listings, including listing 12.15—is supported by substantial evidence.

Mr. C. has objected to the ALJ's conclusions about his inconsistent treatment history, however, on the basis that the ALJ failed to consider how his homelessness and financial

hardships affected his ability to seek or comply with plans for treatment.[6]  *See* Pl. Mem. at 19–22; Pl. Reply at 14–20.  In support, he points to language in Social Security Ruling 16-3p, 82 Fed. Reg. 49,462 (Oct. 25, 2017), that requires the ALJ to consider "possible reasons" a claimant "may not comply with treatment or seek treatment consistent with the degree of his or her complaints," including the claimant's inability to afford treatment or lack of access to free or low-cost medical services.  *See* Pl. Mem. at 20 (quoting SSR 16-3p at 49,466).

Mr. C. is correct that the ALJ was required to consider whether Mr. C.'s homelessness affected his ability to consistently seek out or remain complaint with treatment regimens for his mental illness.  But the record indicates she did just that:  She noted that Mr. C.'s financial situation and homelessness "certainly affect his ability to remain compliant with treatment and maintain appointments."  AR 24.  In her estimation, however, the evidence did not support the conclusion that homelessness and financial hardship were the *only* barriers to Mr. C.'s treatment. *See id.* at 24–25.  She noted that, even at times when Mr. C. was not homeless, he still declined to comply with treatment plans involving medication.  *See* AR 24 (giving weight to medication noncompliance during a period when Mr. C. lived in Texas with a fiancé); *see also, e.g.*, AR 404 (noting, during relevant period, that Mr. C. "has not had his meds in 2 months," although he was "reporting today" he was taking his medications as prescribed); AR 419 (noting, during relevant period, that Mr. C. would be provided education "on adhering to medication compliance").  *Cf. also* AR 413 (noting, during relevant period, that a "strength" in Mr. C.'s "life domain

---

[6] Mr. C. casts this objection as related to step four of the Commissioner's decision.  *See* Pl. Mem. at 19.  Although the ALJ discussed Mr. C.'s treatment history and noncompliance with treatment regimens in that section of her decision, her analysis provides support for her step three conclusions, as discussed above.  The undersigned accordingly considers Mr. C.'s objections related to his homelessness and financial difficulties to be objections to the ALJ's conclusions at step three.

functioning" was his report of "going to a clinic today to get medication").  Record evidence also suggests Mr. C. lost his housing in Texas in November 2015, before he relocated to D.C., *see* AR 421 ("[Mr. C.] reports needing a place to live.  He no longer has housing and has been going to Star of Hope."), and at that time had "reported seeing progress with the medications."  AR 422. He remained "stable on medications" into February 2016, apparently while still homeless.  AR 432.  Substantial evidence thus supports the ALJ's conclusion that Mr. C.'s sporadic treatment history was not solely a function of his homelessness or financial instability, and instead reflected that he "does not take his mental impairment seriously enough to warrant continuous treatment."  AR 25.

This Court may not reweigh the evidence considered by the ALJ.  *See Cunningham*, 46 F. Supp. 3d at 32.  The undersigned may only determine whether substantial evidence supports the Commissioner's decision.  *See Butler*, 353 F.3d at 999.  As it appears that both the ALJ's Paragraph B and Paragraph C conclusions meet this standard, the undersigned recommends that this Court affirm the Commissioner's decision that Mr. C. failed to establish a disability at step three.

## II.     Substantial Evidence Does Not Support the Commissioner's Conclusion Regarding Mr. C.'s Residual Functional Capacity

Having determined that Mr. C.'s mental impairments did not meet or equal an impairment in the Listings, the Commissioner was next required to assess Mr. C.'s residual functional capacity, or "RFC."  *See* 20 C.F.R. § 404.1520(a)(4), (e); *id.* § 416.920(a)(4), (e).  The ALJ determined that Mr. C.'s mild limitation on understanding, remembering, and applying information; his moderate limitation on interacting with others; his moderate limitation concentrating, persisting, and maintaining pace; and his moderate limitation adapting or managing himself resulted in a residual functional capacity to:

> [P]erform a full range of work at all exertional levels but with the following
> nonexertional limitations: [1] carrying out simple tasks in 2-hour increments with
> 15-minute breaks in-between; [2] having occasional interaction with coworkers and
> supervisors but no direct interaction with the general public; and [3] adapting to
> simple changes in a routine work setting.

AR 20.

Mr. C. takes issue with this RFC assessment because he says it does not adequately capture the functional limitations caused by his PTSD and other mental health illnesses. *See* Pl. Mem. at 1–2, 11. He is particularly concerned that the RFC does not reflect his difficulties concentrating and staying on task, *see id.* at 15–17; Pl. Reply at 5–9, or his difficulties interacting with others. *See* Pl. Mem. at 17. The Commissioner assures this Court that the ALJ "specifically accounted for Plaintiff's concentration limitations" through the first RFC element— that Mr. C. could carry out "no more than simple tasks *in two-hour increments with 15-minute breaks in between*." Comm'r Mem. at 14 (emphasis original). She says that Mr. C.'s limitations interacting with others are reflected in the second RFC element—that Mr. C. must have only occasional interaction with coworkers and supervisors and no direct interaction with the public at all. *See id.* at 15.

Substantial evidence supports the ALJ's conclusion that an RFC limiting Mr. C.'s interactions at work sufficiently accounted for his functional limits interacting with others. The ALJ specifically reviewed record evidence indicating that Mr. C. could perform work "not requiring frequent, direct interaction with others," including attending classes to obtain a CDL license and working as a commercial driver. AR 26. She also addressed and weighed testimony from Ms. Williams that Mr. C. had "communication difficulties," finding her anecdotes were only partially supported by Mr. C.'s medical file. AR 27. This analysis is sufficient to show that the ALJ considered the relevant evidence and reached a conclusion based on that evidence. This Court should defer to such conclusions. *See Rossello*, 529 F.3d at 1185.

The same cannot be said for the ALJ's decision regarding Mr. C.'s difficulties concentrating, persisting, or maintaining pace.  Limitations in these areas affect a person's ability to "focus attention on work activities and stay on task at a sustained rate," for example by "working at an appropriate and consistent pace; completing tasks in a timely manner . . . ; and working a full day without needing more than the allotted number or length of rest periods during the day."  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)(3).  Mr. C. asserts that his "moderate" limitation in this area is not reflected in the ALJ's assessment that he had the residual functional capacity to carry out simple tasks in two-hour increments with fifteen-minute breaks between.  *See, e.g.*, Pl. Mem. at 16–17; Comm'r Mem. at 14–15; Pl. Reply at 5–14.

The Commissioner insists that an RFC limiting Mr. C. to performing simple tasks during two-hour increments separated by fifteen-minute breaks is consistent with a moderate limitation in this area of functioning, and points to several cases confirming the point.  *See* Comm'r Mem. at 14–15 (citing *Gill v. Berryhill*, No. 3:17-cv-430, 2018 WL 2107196 (W.D.N.C. May 7, 2018); *Neyer v. Comm'r*, No. SAG-14-3343, 2015 WL 5773239 (D. Md. Sept. 29, 2015); *Hicklin-Jones v. Colvin*, No. 3:14-cv-584, 2015 WL 8958542 (W.D.N.C. Dec. 15, 2015); and *Fowler v. Colvin*, No. 3:14-cv-855, 2015 WL 8488971 (E.D. Va. Oct. 13, 2015)).  These cases suggest that an "explanation of how long a claimant is able to sustain concentration and attention to perform tasks is a direct accounting for the claimant's ability to stay on task," and is accordingly a proper type of RFC to account for difficulties in concentration, persistence, and pace.  *Gill*, 2018 WL 2107196, at *4.

The undersigned does not believe that the law supports the ALJ's RFC assessment in this case, however.  To start, the cases cited by the Commissioner are unpublished decisions from another circuit that do not bind this Court.  Neither this Court nor the D.C. Circuit has yet

determined whether an RFC that acknowledges an individual can perform only simple tasks in two-hour increments with fifteen-minute breaks is adequate to capture a claimant's moderate mental limitations in concentration, persistence, or pace.

The undersigned is moreover convinced by caselaw and non-binding agency directives that two-hour periods of concentration followed by short breaks is "no restriction at all, because a normal workday anticipates" a similar schedule, even for unimpaired workers.  Pl. Reply at 7 (quoting *Reeves v. Berryhill*, No. 2:16-cv-114, 2018 WL 1547856, at *2 (M.D. Tenn. Mar. 5, 2018)); *see also* Pl. Reply at 6–9 (developing the theory and citing, among other sources, the SSA's Program Operations Manual System (POMS) DI 25020.010 (eff. Apr. 5, 2007)).[7] Because the ALJ determined that Mr. C. suffers a moderate limitation in concentrating, persisting, or maintaining pace, *see* AR 19, it makes sense that Mr. C. cannot therefore have a residual functional capacity to perform work at the same level as an individual with no functional limitations concentrating, persisting, or maintaining pace.  If he could, the undersigned would at least expect some articulated reason for that determination.

---

[7] The cited POMS policy, entitled "Mental Limitations," indicates that "the ability to maintain concentration and attention for extended periods (the *approximately 2-hour segments between arrival and first break, lunch, second break, and departure*)" is a mental ability "needed for any job."  *Id.* § (B)(2)(a) (emphasis added).  POMS guidance lacks "the administrative formality or other attributes that would justify substantial judicial deference under *Chevron*" and accordingly "at best qualif[ies] for the more limited form of deference accorded under *Skidmore*."  *Power v. Barnhart*, 292 F.3d 781, 786 (D.C. Cir. 2002) (internal citation omitted).  The undersigned nevertheless finds this POMS language useful, particularly because the manual is meant to provide "general adjudicative guidelines" for making determinations about individuals' functional workplace limitations.  *See* POMS DI 25020.001.  Mr. C. also directed the Court to Social Security Ruling 96-9p, which contemplates similar periods of active employment in "2-hour intervals" separated by "a morning break, a lunch period, and an afternoon break."  Pl. Reply at 7–8; Soc. Sec. Ruling 96-9p, 61 Fed. Reg. 34,478, 34,482 (July 2, 1996).  Social Security Rulings are binding on the ALJ and all components of the Social Security Administration.  *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990).  SSR 96-9p applies only to sedentary work, however, and so appears inapplicable to this case.

None of the other RFC assessments made by the ALJ in this case could apply to Mr. C.'s concentration-based limitations, either. *See Petty v. Colvin*, 204 F. Supp. 3d 196, 206 (D.D.C. 2016) (holding that an RFC limiting work to "simple, routine, and repetitive tasks at the unskilled level" did not adequately capture the plaintiff's "moderate limitations in concentration, persistence, or pace"); *see also O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) ("The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity."). It thus appears that the ALJ here either assumed Mr. C. had the same residual functional capacity to concentrate and stay on task as an unimpaired worker, despite his moderate functional limitations in this area, or altogether failed to account for his moderate functional limitations concentrating, persisting, and maintaining pace.

The problem is exacerbated by the way the ALJ presented her decision. ALJ decisions denying disability benefits must include a "'narrative discussion describing how the evidence supports each conclusion'" so that the Court can assess whether an "'accurate and logical bridge'" links the record evidence to the ALJ's conclusions. *Dowell v. Colvin*, 232 F. Supp. 3d 1, 8 (D.D.C. 2017) (quoting Soc. Sec. Ruling 96-8p, 61 Fed. Reg. 34,474 (July 2, 1996), and *Williams*, 134 F. Supp. 3d at 364). This bridge is particularly important where there are "inconsistencies [and] ambiguities evident in the record." *Butler*, 353 F.3d at 1000 (quotation omitted). Why, for example, did the ALJ settle on two-hour increments after acknowledging that Mr. C. "endorsed [a] short attention span of twenty minutes or so"? *See* AR 19.

The ALJ also noted she "generally agree[d]" with Dr. Milan and Dr. Heiser's conclusions regarding Mr. C.'s capacity to concentrate, persist, and maintain pace. AR 26. But she afforded these doctors' opinions only "some weight," *id.*, compared to the "significant weight" afforded to Dr. Pelligrini. AR 27. Dr. Pelligrini determined that Mr. C. experienced several concentration-

based functional limitations that impeded his employability, including "difficulties resisting distractions" and "difficulty maintaining concentration."  AR 393.  It is not this Court's role to re-weigh the evidence considered by the ALJ.  *See Cunningham*, 46 F. Supp. 3d at 32.  But the undersigned cannot determine from the record why, "without even a breath of explanation," the ALJ appears to have set aside Dr. Pelligrini's concentration-related opinions after affording her other opinions significant weight.  *See Brown v. Bowen*, 794 F.2d 703, 708 (D.C. Cir. 1986) (quoted language); *see also Warfield*, 134 F. Supp. 3d at 18 (citing *Brown* favorably in the context of a similar conundrum).  With no explanation and no "logical bridge" linking the ALJ's findings and conclusions, the undersigned cannot trace the ALJ's line of reasoning, and so cannot conclude that the Commissioner's RFC assessment is supported by substantial evidence.  *See Dowell*, 232 F. Supp. 3d at 8; *Williams*, 134 F. Supp. 3d at 364.

Ultimately, the ALJ's step five determination that Mr. C. could successfully adjust to available work in the national economy—and was therefore not disabled or entitled to benefits under the Social Security Act—was based on her faulty assessment of his RFC.  *See* AR 28–29.  The error was therefore not harmless, *cf. Saunders*, 6 F.4th at 4, and this Court should accordingly remand Mr. C.'s claim for benefits for the Agency so that the Commissioner can reassess Mr. C.'s residual functional capacity and ability to successfully adjust to work in the national economy fitting his RFC, age, educational attainment, and work experience.

## RECOMMENDATION

For the preceding reasons, the undersigned recommends that this Court grant-in-part and deny-in-part Mr. C.'s Motion for Judgment of Remand, ECF No. 13, and grant-in-part and deny-in-part the Commissioner's Motion for Judgment of Affirmance, ECF No. 15.  Specifically, the undersigned recommends that this Court deny Mr. C.'s challenge to the sufficiency of the Commissioner's determination that Mr. C.'s impairments do not meet or equal an impairment in

the Commissioner's Listings.  The undersigned also recommends that the Court remand this case to address Mr. C.'s remaining concern, so that the Agency can properly assess how Mr. C.'s moderate mental limitations in concentration, persistence, and pace affect his residual functional capacity, and whether any change in his assessed residual functional capacity affects Mr. C.'s ability to adjust to work that exists in significant numbers in the national economy.

## REVIEW BY THE DISTRICT COURT

The parties are advised that under the provisions of Local Rule 72.3(b), any party who objects to a Report and Recommendation must file a written objection with the Clerk of Court within 14 days of the party's receipt of the Report and Recommendation.  The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections.  Failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

Dated this March 25, 2022.

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE